**Opinion issued August 2, 2016**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-14-00421-CR

———————————

## ERIC DEWAYNE SMALL, Appellant

## V.

## THE STATE OF TEXAS, Appellee

On Appeal from the 209th District Court
Harris County, Texas
Trial Court Case No. 0985103

## MEMORANDUM OPINION

A jury found appellant, Eric Dewayne Small, guilty of the offense of murder.[1]

After appellant pleaded true to the allegation in an enhancement paragraph that he

---

[1] *See* TEX. PENAL CODE ANN. § 19.02(b) (Vernon 2011).

had previously been convicted of a felony offense, the jury assessed his punishment at confinement for ninety-nine years. In six issues, appellant contends that the evidence is legally insufficient to support his conviction and the trial court erred in denying his motion to suppress his statement, admitting into evidence certain exhibits, charging the jury on the law of transferred intent, and not instructing the jury "to disregard [a]ppellant's statement if it f[ound] the statement [to be] involuntary."

We affirm.

## Background

Raynesha Blackmon testified that on the night of April 11, 2004, she and her best friend, Keneshia Scott, the complainant, went to Cardi's, "[a] teenage [night] club," for a party. However, they did not stay inside the club, which was "[v]ery crowded," for long. After someone had "throw[n] a chair in the air," Blackmon and the complainant immediately "started running" out of the club. They were afraid of "[g]etting hurt" and "knew it was about to get hectic in the club." "[A] lot of people" also ran out of the club at that same time. While the complainant and Blackmon were running to their car in the Cardi's parking lot, Blackmon saw the complainant suddenly stop and "f[a]ll down." Blackmon explained that after the complainant, who had been shot, was "on the ground," "a group of guys r[a]n past" her. At that

2

time, there were "a lot of people" in the parking lot. After a law enforcement officer arrived, the complainant was taken to a hospital, where she later died.

Cornelius Clewis testified that on the night of April 11, 2004, he went to Cardi's, where he saw appellant, who is also known by the nickname "Burger," and Brandz Anderson, the son of appellant's girlfriend.[2] While Clewis was at the club, which was "[c]rowded," a "disruption" occurred; there was "fighting, a couple of chairs, a bottle." And Clewis saw both appellant and Brandz "fighting" with other people. Once the fighting erupted, "people started running . . . [t]owards the [club's] exit" to leave.

Clewis ran out into the Cardi's parking lot, which was "crowded with people," and heard a single gunshot. When he saw appellant in the parking lot, he did not see him with a gun. However, he could not see appellant's hands at the time. And "[a]fter the shot [had been] fired," Clewis noticed that appellant had changed his clothes and was wearing a different shirt than he had been wearing prior to Clewis hearing the gunshot.

Carnell Gay testified that he went to Cardi's on April 11, 2004 with the complainant, who was his friend. After being inside the club for about "15 to 20 minutes," "[a] fight broke out" and "everyone . . . pretty much rushed" out of the

---

[2]     Brandy Anderson is the other son of appellant's girlfriend and is the twin of Brandz Anderson.

club.  Once outside, Gay heard a gunshot.  He immediately "[t]urned . . . towards" the direction from which he had heard the shot and "saw a man pulling his gun from out [of] extension, putting it up[,] and walking away."  The man "had his hand out," and "his arm was on its way down."  Gay identified appellant in court as "the person . . . [he] saw that night in the parking lot with [a] gun," although he did not actually see appellant "shoot" the gun.  Gay simply "heard the shot," turned, and saw appellant with a gun.  He then saw that the complainant had been shot and was "on the ground."  Gay further noted that right before he had heard the gunshot, a group of men had run by the complainant in the parking lot.

After the shooting, Gay and his cousin, Allen Dixon, met with a Houston Police Department ("HPD") sketch artist.  They described to the artist the person that they had seen with the gun in the Cardi's parking lot as "a black male, big build, six feet to six-one and about 19 to 20 years old."  Gay also later viewed two photographic arrays prepared by HPD officers.  In the first photographic array, he identified a person as being similar in appearance to the person depicted in the police artist's sketch, but it was not the person that he had seen with a gun in the Cardi's parking lot.  After viewing the second photographic array, Gay identified a different person as "[t]he actual gunman" that he had seen, and he explained that this individual was not in the first photographic array.

4

Dixon testified that on April 11, 2004, he was with the complainant, his god-sister, at Cardi's. They were inside the club for only "[t]en to 15 minutes" "[b]ecause a fight broke out" and everyone "stampeded out." Dixon "r[a]n out the front door like everybody else," and he looked for the complainant and Blackmon "out towards the parking lot where they had parked." Once outside, he saw a man "with a gun," who looked "pissed off" and was speaking in "a very frantic voice like he was mad at someone." And Dixon identified appellant in court as that man.

Dixon saw appellant "stand[ing] next to someone" who was "pointing" at a "crowd of people." Appellant then pointed his gun "in the same direction that the man who was standing next to him was pointing his finger." When the "group of people ran in front" of appellant, Dixon saw appellant's "arm raise[,] . . . a gun[,] and . . . a shot fired." Appellant "pulled the trigger" and "shot one time" at the exact same time as "the group of people . . . ran by" him. "[T]he group" passed through a gap between appellant and the complainant. Dixon explained, "I saw the gun. I saw the fire come from the end of the gun and [the complainant] hit the ground." Specifically, as the shot was fired, he "heard a yell and . . . saw [the complainant] reach out and then . . . hit the ground." Dixon did not see anyone other than appellant with a gun in the Cardi's parking lot. And he was "confident" that

5

appellant was "the same man that [he] saw shoot [the complainant] in the parking lot of Cardi's."[3]

Following the shooting, Dixon worked with an HPD sketch artist to create an image of the gunman. Dixon described to the artist the gunman as a "black male, big build, six feet to six-one, 19 to 20 years old." He also later viewed two photographic arrays prepared by HPD officers. Although Dixon identified someone in the first photographic array, he "remark[ed] to the [HPD] officers that [he] had . . . concerns about the person that [he had] identified." When Dixon later viewed the second photographic array, he identified "the shooter [from] that night" "almost immediately."

DeWarren Knowles testified that he went to Cardi's on the night of April 11, 2004 with appellant, who was also known by the nickname "Burger." He explained that appellant was "like [a] stepfather" to "Brandz and Brandy Anderson." Prior to going to the club that night, Knowles went to appellant's house "to chill" and drink alcohol. Appellant then drove Knowles to the club, where they initially sat in appellant's car in the club's parking lot "talking and drinking and finishing off the last cup of the alcohol [that they] had." Once they entered the club, "a big fight

---

[3]     During Dixon's testimony, the trial court admitted into evidence State's Exhibits 7, 8, and 9, photographs showing the location where Dixon was standing outside of Cardi's, the location where appellant was standing in the parking lot, and the location where the complainant was "standing outside the club at the time that she was shot."

6

broke out" and everyone "start[ed] running . . . out [of] the club." Knowles left the club too. Once outside, he saw appellant, who was holding a gun and "mad about something." Appellant was "screaming something . . . loudly." After Knowles heard a gunshot, he saw appellant lowering his arm. And Knowles noted that he did not see anyone else with a gun in the parking lot that night.

Knowles explained that he tried to find an alternate ride home from the club after the shooting, but he could not. He later saw appellant, who had since changed his clothes, in his car leaving the parking lot, and Knowles asked him for a ride home. When Knowles entered the car, appellant was "jumpy." Knowles then asked appellant, "Did you shoot?" Initially, appellant responded, "No," but then said, "I don't know. . . . Well, I think I was trying to shoot at them dudes, but I shot that girl." When appellant said that he thought he had shot a girl, Knowles believed him.

HPD Officer M. Davis testified that on April 11, 2004, while on patrol near Cardi's, he heard "a shot fired as [he] was driving down the road." When he arrived at the Cardi's parking lot, "[i]t was crowded" and "chaotic." Because Davis was the first responder, his focus was on "deal[ing] with the [c]omplainant," who was subsequently transported to a hospital by an ambulance. Davis also explained that a gun is a firearm and a deadly weapon.

HPD Officer B. Harris, assigned to investigate the murder of the complainant, testified that she was shot in the Cardi's parking lot. During the course of his

7

investigation, "Burger" developed as "a nickname for a suspect," and the first person that he was "able to put with the name" of "Burger" was Bertis Lewis. Harris then compiled a photographic array, which included a photograph of Lewis, and he showed the array separately to Gay and Dixon.[4] They both identified Lewis, and he was taken into custody.

Officer Harris continued his investigation after Lewis's arrest, subsequently learning that appellant is "Burger," who is a "step dad[]" to Brandy and Brandz. He also learned that Brandz, in the Cardi's parking lot on the night of the shooting, actually directed appellant where to shoot his gun by "pointing." In other words, Harris determined that Brandz was "a party to the crime," i.e., he "aid[ed], assist[ed,] or encourage[d] [Burger] to carry out [the murder]," and HPD officers later arrested Brandz.

Officer Harris explained that he then compiled a second photographic array, which included a photograph of appellant and five other men, including Lewis.[5] The men in the second photographic array were all the same race and had "characteristics," "hair," and "facial features" similar to appellant. When Gay and Dixon were separately shown the second photographic array, they both identified

---

[4]    The trial court admitted into evidence, as State's Exhibit 11, the first photographic array, which contained a photograph of Lewis.

[5]    The trial court admitted into evidence, as State's Exhibit 12a, the second photographic array, which included photographs of both appellant and Lewis.

8

appellant as the gunman in the Cardi's parking lot. As a result of Gay's and Dixon's identifications of appellant as the shooter, the State dismissed its case against Lewis, and HPD officers arrested appellant.

Following appellant's arrest, Officer Harris interviewed him while he was in custody at the Camp County Jail. Although Harris's partner, HPD Officer Moreno, accompanied Harris to the jail, Moreno left the interview-room before Harris began appellant's interview. Once appellant entered the room, Harris advised him of his "constitutional rights," which appellant indicated that he understood and waived. Appellant then spoke with Harris and provided a tape-recorded statement during the interview.[6] Harris explained that there were two portions of the interview, a recorded portion and an unrecorded portion. The unrecorded portion of the interview lasted "almost three hours," while the recorded portion lasted "about 45 minutes."

Officer Harris explained that he never "threaten[ed]" appellant and did not "promise him anything in exchange for speaking." During the interview, appellant never asked to "terminate the interview" or to have an attorney provided. He was not "deprive[d]" of food or use of the restroom. Harris concluded his testimony, noting that a gun is a firearm and "a firearm is capable of causing death or serious bodily injury."

---

[6] Before trial, appellant moved to suppress his tape-recorded statement. Following a hearing, the trial court denied appellant's motion.

In his tape-recorded statement, which the trial court admitted into evidence during Officer Harris's testimony, appellant stated that he was at Cardi's on the night of the shooting and was involved in a fight. Appellant also stated that he owned a gun, "a nine-millimeter," and "one fire was discharged from [his] weapon." And although appellant asserted that he acted in "[s]elf-defense" in the Cardi's parking lot, he "didn't mean to hurt nobody," and "the gun got fired on accident," he did acknowledge that he fired his gun and he was "the one responsible for . . . th[e] tragic accident" that killed the complainant. According to appellant, shots were also fired from a car that "pull[ed] up" to the club, appellant was "hit by a bottle" and "kicked" in the ribs, and "[t]here w[ere] people with knives" in the crowd.

Kim Downs, a firearms examiner in the HPD Firearms Laboratory, testified that the bullet recovered from the complainant's body traveled in "a straight path from the gun" into her body. It did not "ricochet[]" off of anything before hitting the complainant. And the bullet was "consistent with having been fired from a .9 millimeter Luger firearm."

Ana Lopez, a Harris County assistant medical examiner, testified that the complainant suffered from "a gunshot wound," which eventually caused her to bleed to death. Specifically, Lopez explained that the complainant "died as a result of a gunshot wound [to] the right buttock into the abdomen." The trial court admitted into evidence autopsy photographs of the complainant during Lopez's testimony. In

10

conjunction with their admittance, Lopez explained that she initially performed an "external examination" of the complainant's body, during which she discovered the "gunshot wound . . . on the right buttock." Lopez then began an "internal examination" of the complainant's body, looking at "the thoracic, the chest[,] and [the] abdominal cavity" in order to document the injury to the complainant's internal organs. Lopez explained:

> The bullet entered [the complainant's] pelvis and fractured her pelvic bone. It also perforated the inferior vena cava and the aorta in the abdominal cavity. It went through the small bowel mesentery, which is the root of the small bowel. . . . [The complainant] also had injuries to the stomach and injuries to the spleen.

Further, Lopez noted that the complainant had undergone "surgical intervention" at the hospital in an attempt to save her life. However, the complainant ultimately "bled to death," in spite of the medical treatment she received.

## Sufficiency of the Evidence

In his fourth issue, appellant argues that the evidence is legally insufficient[7] to support his conviction because "the State . . . fail[ed] to establish" his "intent to kill the complainant." He asserts that the State, relying on the transferred-intent

---

[7] In one sentence in his brief, appellant asserts that "[t]he evidence is legally and *factually* insufficient to establish [his] intent." (Emphasis added.) To the extent that appellant is challenging the factual sufficiency of the evidence, we note that we now review factual-sufficiency challenges under the same appellate standard of review as that for legal sufficiency. *Ervin v. State*, 331 S.W.3d 49, 52–56 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd).

doctrine to establish his intent, did not "produce evidence that [he] intended to kill a specific person" other than the complainant. *See* TEX. PENAL CODE ANN. § 6.04(b) (Vernon 2011) (transferred-intent doctrine).

We review the legal sufficiency of the evidence by considering all of the evidence in the light most favorable to the jury's verdict to determine whether any "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S. Ct. 2781, 2788–89 (1979); *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Our role is that of a due process safeguard, ensuring only the rationality of the trier of fact's finding. *See Moreno v. State*, 755 S. W.2d 866, 867 (Tex. Crim. App. 1988). We give deference to the responsibility of the fact finder to fairly resolve conflicts in testimony, weigh evidence, and draw reasonable inferences from the facts. *Williams*, 235 S.W.3d at 750. However, our duty requires us to "ensure that the evidence presented actually supports a conclusion that the defendant committed" the criminal offense of which he is accused. *Id.*

A person commits the offense of murder if he intentionally or knowingly causes the death of an individual, or if he intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. *See* TEX. PENAL CODE ANN. § 19.02(b) (Vernon 2011). A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct

12

when it is his conscious objective or desire to engage in the conduct or cause the result. *Id.* § 6.03(a) (Vernon 2011). A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b); *see also Schroeder v. State*, 123 S.W.3d 398, 400 (Tex. Crim. App. 2003) ("Murder is a 'result of conduct' offense, which means that the culpable mental state relates to the result of the conduct, i.e., the causing of the death."). "'Serious bodily injury' means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." TEX. PENAL CODE ANN. § 1.07(a)(46) (Vernon Supp. 2015).

"Intent is almost always proven by circumstantial evidence." *Trevino v. State*, 228 S.W.3d 729, 736 (Tex. App.—Corpus Christi 2006, pet. ref'd); *see also Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002) ("Direct evidence of the requisite intent is not required . . . ."); *Smith v. State*, 56 S.W.3d 739, 745 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd). "A jury may infer intent from any facts which tend to prove its existence, including the acts, words, and conduct of the accused, and the method of committing the crime and from the nature of wounds inflicted on the victims." *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999). A jury may also infer knowledge from such evidence. *See Stahle v. State*, 970 S.W.2d

13

682, 687 (Tex. App.—Dallas 1998, pet. ref'd); *Martinez v. State*, 833 S.W.2d 188, 196 (Tex. App.—Dallas 1992, pet. ref'd).

Further, the intent to kill a complainant may be inferred from the use of a deadly weapon in a deadly manner. *Adanandus v. State*, 866 S.W.2d 210, 215 (Tex. Crim. App. 1993); *Watkins v. State*, 333 S.W.3d 771, 781 (Tex. App.—Waco 2010, pet. ref'd). If the defendant uses a deadly weapon in a deadly manner, the inference of intent to kill is almost conclusive. *Watkins*, 333 S.W.3d at 781; *Trevino*, 228 S.W.3d at 736. And when a deadly weapon is fired at close range and death results, the law presumes an intent to kill. *Womble v. State*, 618 S.W.2d 59, 64–65 (Tex. Crim. App. 1981); *Trevino*, 228 S.W.3d at 736. A firearm is a deadly weapon per se. TEX. PENAL CODE ANN. § 1.07(a)(17).

Here, the jury heard testimony from several witnesses that appellant was at Cardi's on the night of April 11, 2004. And appellant was seen by Clewis "fighting" inside the club. After the fighting erupted and "everyone . . . rushed" and "stampeded" outside, several witnesses saw appellant in the club's parking lot. Knowles and Dixon testified that appellant looked "mad about something" and "pissed off," was "screaming something . . . loudly," and was speaking in "a very frantic voice like he was mad at someone." And Knowles, Dixon, and Gay all testified that appellant was holding a gun.

14

Dixon specifically testified that he saw appellant's "arm raise[,] . . . a gun[,] and . . . a shot fired." He "saw the gun," "the fire come from the end of the gun," and the complainant "hit the ground." And he was "confident" that appellant was "the same man that [he] saw shoot [the complainant] in the parking lot of Cardi's." Further, during Dixon's testimony, the trial court admitted into evidence State's Exhibit 9, which shows that appellant was in close proximity to the complainant when he fired his gun.

Knowles testified that he heard a gunshot and saw appellant lowering his arm. And appellant later told him, "I shot that girl." Gay testified that after he had heard a gunshot, he looked in the direction from which he had heard the shot and saw appellant "putting [his gun] up" and his "arm was on its way down." Gay then saw that the complainant had been shot and was "on the ground." Clewis and Knowles also noted that appellant changed his clothes after the shooting and left the scene. And appellant was the only person that witnesses identified as having a gun in the Cardi's parking lot on April 11, 2004.

Further, Downs, the HPD firearms examiner, testified that the bullet traveled in "a straight path from the gun" into the complainant's body and did not "ricochet[]" off of anything before hitting her. Downs also explained that the bullet recovered from the complainant's body was "consistent with having been fired from a .9 millimeter Luger firearm." And Lopez, the assistant medical examiner, testified that

15

the complainant bled to death, "as a result of a gunshot wound [to] the right buttock into the abdomen."

Finally, appellant, in his own tape-recorded statement, admitted that he was at Cardi's the night of the shooting and had been involved in a fight. Appellant also conceded that he owned a gun, "a nine-millimeter" and "one fire was discharged from [his] weapon." Although appellant asserted that he acted in "[s]elf-defense," he "didn't mean to hurt nobody," and "the gun got fired on accident," he did acknowledge that he fired his gun and was "the one responsible for . . . th[e] tragic accident" that killed the complainant. Appellant also revealed that he gave his gun to "[a] friend" after the shooting and "told him to keep it."

We note that in determining a defendant's guilt, a jury may consider events that occur before, during, and after the commission of an offense, such as the fleeing of the scene, disposing of a weapon, and changing clothes. *See Pitonyak v. State*, 253 S.W.3d 834, 844–45 (Tex. App.—Austin 2008, pet. ref'd); *Martin v. State*, 151 S.W.3d 236, 245 (Tex. App.—Texarkana 2004, pet. ref'd); *see also King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000) (jury may consider evidence showing consciousness of guilt). Although appellant, in his tape-recorded statement, asserted that he "didn't mean to hurt" anyone and the firing of his weapon was an "accident," the jury, as the exclusive judge of the facts, credibility of the witnesses, and weight to be given to their testimony, was free to believe or disbelieve all or any part of

appellant's statement.  *See Sorto v. State*, 173 S.W.3d 469, 475 (Tex. Crim. App. 2005); *McKinny v. State*, 76 S.W.3d 463, 468–69 (Tex. App.—Houston [1st Dist.] 2002, no pet.).  And we assume that the jury resolved any conflicts in favor of the verdict.  *Matchett v. State*, 941 S.W.2d 922, 936 (Tex. Crim. App. 1996).

In regard to appellant's assertion that the State relied on the transferred-intent doctrine[8] to establish his intent to kill the complainant, the State, contrary to appellant's assertion, did not have to rely on that doctrine to prove that he possessed the culpable mental state associated with murder.  *See Manrique*, 994 S.W.2d at 650 (Meyers, J., concurring) ("While the evidence would support convictions based on the theory of transferred intent, that theory was by no means necessary.  The evidence in some cases will support a conviction regardless of whether the State decides to pursue a transferred intent theory."); *Trevino v. State*, 228 S.W.3d 729, 737–38 (Tex. App.—Corpus Christi 2006, pet. ref'd) ("[J]ury could reasonably infer that by opening fire with a semi-automatic weapon on an occupied vehicle, [defendant] specifically intended to kill either or both of the occupants" or "under the theory of transferred intent, the jury could reasonably infer that [defendant] intended to shoot and kill [one person], but instead killed [another]."); *cf. Marquez*

---

[8]     "A person is nevertheless criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated, or risked is that:  (1) a different offense was committed; or (2) a different person or property was injured, harmed, or otherwise affected."  TEX. PENAL CODE ANN. § 6.04(b) (Vernon 2011).

*v. State*, No. 11-13-00192-CR, 2015 WL 4720801, at *3 (Tex. App.—Eastland July 31, 2015, pet. ref'd) (mem. op., not designated for publication) (evidence sufficient on issue of intent and noting although evidence would have supported conviction under transferred-intent theory, State did not rely "on a theory of transferred intent to support the conviction").

Here, the jury could have reasonably inferred appellant's intent to kill the complainant solely from his use of a deadly weapon at close range. *See Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996); *Womble*, 618 S.W.2d at 64–65. Thus, viewing all the evidence, and the reasonable inferences that can be drawn from it, in the light most favorable to the jury's verdict, we conclude that a rational trier of fact could have reasonably found that appellant intentionally or knowingly caused the death of the complainant. Accordingly, we hold that the evidence is legally sufficient to support appellant's conviction of the offense of murder.[9]

---

[9] Having held that the State presented sufficient evidence to establish that appellant intentionally or knowingly caused the complainant's death, we need not address whether the State presented sufficient evidence to establish that appellant intended to cause serious bodily injury to the complainant and committed an act clearly dangerous to human life that caused her death. *See* TEX. PENAL CODE ANN. § 19.02(b). Appellant stood accused by indictment of violating Texas Penal Code sections 19.02(b)(1) and 19.02(b)(2), and the jury found appellant guilty of murder "as charged in the indictment." "[W]hen a general verdict is returned and the evidence is sufficient to support a finding under any of the paragraphs submitted, the verdict will be applied to the paragraph finding support in the facts." *Amis v. State*, 87 S.W.3d 582, 587 (Tex. App.—San Antonio 2002, pet. ref'd) (quoting *Manrique v. State*, 994 S.W.2d 640, 642 (Tex. Crim. App. 1999)).

18

We overrule appellant's fourth issue.

## Suppression of Statement

In his first issue, appellant argues that the trial court erred in denying his motion to suppress his statement made to Officer Harris at the Camp County Jail because "Harris promised leniency for Brandz" in exchange for appellant's statement and the "totality of the circumstances" show that he made his statement involuntarily.

We review a trial court's denial of a motion to suppress evidence under a bifurcated standard of review. *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013). We review the trial court's factual findings for an abuse of discretion and the trial court's application of the law to the facts de novo. *Id.* The trial court is the sole and exclusive trier of fact and judge of the witnesses' credibility and may choose to believe or disbelieve all or any part of the witnesses' testimony. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). If, as in this case, the trial court makes express findings of fact, we review the evidence in the light most favorable to the trial court's ruling and determine whether the evidence supports the fact findings. *See Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). A trial court's findings on a motion to suppress may be written or oral. *See State v. Cullen*, 195 S.W.3d 696, 699 (Tex. Crim. App. 2006); *State v. Groves*, 837 S.W.2d 103, 105 n.5 (Tex. Crim. App.

19

1992).  We give almost total deference to the trial court's determination of historical facts, particularly when the trial court's fact findings are based on an evaluation of credibility and demeanor.  *Valtierra*, 310 S.W.3d at 447.

We review the trial court's legal ruling de novo unless its explicit findings that are supported by the record are also dispositive of the legal ruling.  *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006).  We will sustain the trial court's ruling if it is reasonably supported by the record and is correct on any theory of law applicable to the case.  *Valtierra*, 310 S.W.3d at 447–48.  In determining whether the trial court's ruling on a motion to suppress is supported by the record, we generally consider only the evidence adduced at the hearing on the motion unless the suppression issues have been consensually relitigated by the parties during the trial on the merits.  *Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996).

Prior to trial, appellant moved to suppress "any conversations between [himself] and law enforcement officers," specifically, the tape-recorded statement that he gave to Officer Harris at the Camp County Jail.

Following a suppression-hearing, the trial court denied appellant's motion and issued the following pertinent findings of fact and conclusions of law:

4. **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

a. [Officer] Harris was a credible witness.

b. [Appellant] was not a credible witness.

20

c.     [Officer Moreno's] statement to [appellant] before Harris began to speak to [appellant] was not an intimidation tactic.

d.     Harris informed [appellant] of his rights twice: once when Harris first began to interview [appellant] and again when Harris began to record his interview with [appellant].

e.     [Appellant] understood his rights and waived them.

f.     Throughout the interview, [appellant] did not request an attorney or ask to end the interview.

g.     [Appellant] was coherent and was not under the influence of alcohol or drugs.

h.     During the interview Harris offered [appellant] water.

i.     [Appellant] never indicated that he needed to use the restroom or that he wanted to stop the interview and leave the room.

j.     Harris did not promise [appellant] anything to compel him to make a statement, including any lenient treatment of [Brandz], and did not threaten [appellant] into giving a statement.

k.     [Appellant] made this statement freely and voluntarily.

l.     While [appellant] did not want to record his statement initially, he eventually agreed to let Harris record his statement.

m.     Harris only recorded [appellant]'s statement after [appellant] agreed to have the interview recorded.

n.     [Appellant]'s recorded statement was on one tape but was recorded on both sides of that tape.

21

o.    Harris played two tapes for [Rochelle] Jenkins: one containing [appellant]'s statement and the other containing [Brandz]'s statement.

p.    Harris did not record two tapes of [appellant]'s statement.

q.    Harris did not tell Jenkins that he promised leniency to [Brandz] if [appellant] gave a statement.

On appeal, appellant first argues that he made his statement involuntarily because Officer Harris "improper[ly] induce[d]" him into providing it by "promis[ing] leniency for Brandz . . . in exchange for the statement."

To be admissible as evidence, a defendant's statement must be "freely and voluntarily made without compulsion or persuasion." TEX. CODE CRIM. PROC. ANN. art. 38.21 (Vernon 2015). In assessing the voluntariness of a statement, we consider the totality of the circumstances under which the statement was made, and ultimately, whether appellant's will was overborne. *See Creager v. State*, 952 S.W.2d 852, 855–56 (Tex. Crim. App. 1997); *Reed v. State*, 59 S.W.3d 278, 281 (Tex. App.—Fort Worth 2001, pet. ref'd). A statement is involuntary if the circumstances show that the statement was induced by a promise of a benefit. *See Ramirez v. State*, 76 S.W.3d 121, 126–27 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd).

To render a defendant's statement invalid under article 38.21, there must be (1) a promise of some benefit to the accused, (2) that is positive, (3) made or sanctioned by someone in authority, and (4) of such an influential nature that it

22

would cause a defendant to speak untruthfully. *Martinez v. State*, 127 S.W.3d 792, 794 (Tex. Crim. App. 2004); *Herrera v. State*, 194 S.W.3d 656, 659–60 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd). The truth or falsity of the promise is immaterial; the question is whether the promise likely would induce a false statement. *Martinez*, 127 S.W.3d at 794–95; *Herrera*, 194 S.W.3d at 660. General, unspecific offers to help are not likely to induce one to make an untruthful statement and will not invalidate a statement. *See Dykes v. State*, 657 S.W.2d 796, 797 (Tex. Crim. App. 1983). Similarly, general representations made to a suspect regarding how his statement could possibly result in leniency do not render a statement involuntary. *See Muniz v. State*, 851 S.W.2d 238, 253–54 (Tex. Crim. App. 1993). Any prediction about future events is not a promise. *Mason v. State*, 116 S.W.3d 248, 260–61 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) (officer's representations situation would "go better" for defendant by giving statement was prediction about future event, not promise). And even specific, unequivocal promises can lack the persuasive impact needed to show that they will probably induce an accused to make an untruthful statement. *See Muniz*, 851 S.W.2d at 253–54; *Espinosa v. State*, 899 S.W.2d 359, 364 (Tex. App.—Houston [14th Dist.] 1995, pet. ref'd).

At the hearing on appellant's suppression-motion, he testified that during his interview with Officer Harris at the Camp County Jail, he repeatedly told Harris that

he "didn't want to talk." However, appellant ultimately spoke with Harris because he "told [appellant] that he had something on Brandz" and "Brandz was going to end up spending a lot of time in jail if [appellant] didn't talk to him." Harris told appellant that "he would let Brandz go if [appellant] talked about what happened" at Cardi's on April 11, 2004. Thus, appellant felt "pressured" to speak with Harris, "interpret[ed] what . . . Harris said to [him] as . . . a promise to let Brandz go" if he spoke with Harris, and this was the "only reason why" appellant spoke with Harris "about what happened."

Appellant further testified that "allowing Brandz . . . to go free [would] benefit" appellant because he "love[s] Brandz" and, at the time he made his statement, his "feelings got involved." However, appellant also stated that he would have gained "[n]othing" if "Brandz [were to] go[] free," he was not related to Brandz, and Brandz was only his girlfriend's son. Further, appellant stated that Officer Harris did not threaten him during his interview.

Rochelle Jenkins, appellant's girlfriend, also testified at the suppression-hearing. She met with Officer Harris and spoke to him about appellant and her son, Brandz. According to Jenkins, Harris "ma[d]e . . . promises to [appellant] to get him to talk," and "he got [appellant's] testimony as a result of telling [him] that they would release [Brandz]." However, Jenkins also stated that Harris "didn't say I

promise to release" Brandz, and she did not hear Harris promise anything to appellant on the tape-recording of appellant's statement.

Officer Harris, at the suppression-hearing, offered a different version of events surrounding appellant's interview. He explained that while interviewing appellant, he did not "coerce or threaten [appellant] in any way into giving [him] a statement," nor did he "[a]t any time[,] . . . directly or indirectly[,] promise [appellant] anything in exchange for his statement." More specifically, Harris did not tell appellant "that if he spoke with [him] about what happened on the night in question that [Harris] would [make] arrangements to let Brandz . . . go home," nor did he state that "Brandz would be free from a long time in jail if [appellant] ever gave a statement." Further, Harris did not tell Jenkins that "Brandz would be released [from custody] if [appellant] gave a statement."

Additionally, Officer Harris explained that after reading appellant his legal rights, appellant indicated that he understood those rights and "he agree[d] that he would go ahead and speak with [Harris] in spite of those rights." At no point during the interview did appellant "ever tell [Harris] that he did not want to talk."

We initially note that the trial court was free to disbelieve the testimony of appellant and Jenkins about any "promise" that Officer Harris made in exchange for appellant's statement. Likewise, the trial court was free to believe Harris's testimony that he made no such promise, directly or indirectly, to appellant in

25

exchange for his statement. *See State v. Ballard*, 987 S.W.2d 889, 891 (Tex. Crim. App. 1999) ("[T]he trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given [to] their testimony."); *Muniz*, 851 S.W.2d at 253–54 (trial court, "as the exclusive judge of witness credibility, acted well within its authority in disbelieving [defendant]'s assertions" of threats and coercion by law enforcement officers).

Moreover, we cannot conclude that Officer Harris's alleged promise of leniency towards Brandz, the son of appellant's girlfriend, was sufficient to induce appellant to speak untruthfully. *See Muniz*, 851 S.W.2d at 253–54 (promise by law enforcement officer of aide for defendant's pregnant wife and sick mother "could [not] influence a person to untruthfully confess to the heinous crime"); *Salazar v. State*, 687 S.W.2d 502, 503–04 (Tex. App.—Dallas 1985, pet. ref'd) (promise of "leniency towards other persons . . . is not the type of promise that would likely influence a person to speak untruthfully"); *see also Espinosa*, 899 S.W.2d at 364 (general promises of leniency "do not render a confession involuntary"). Thus, in addition to believing Harris and disbelieving appellant and Jenkins, the trial court could have reasonably concluded that any promise of leniency made by Harris regarding Brandz did not render appellant's statement involuntary.

Appellant next argues that the "totality of the circumstances" prove that he involuntarily made his statement to Officer Harris because "Harris had a four hour

26

conversation with [a]ppellant yet only recorded less than half of it," "[a]ppellant was subjected to intimidation tactics by [Officer] Moreno leading up to the initial conversation" between himself and Harris, and Harris's discussion with appellant about "justice and mercy . . . lead[] to [a]ppellant's incriminating statements."

In regard to the length of appellant's interview and the recording of his statement, Officer Harris testified that after he had advised appellant of his legal rights, appellant indicated that he understood those rights and agreed to waive them and speak with Harris. Harris and appellant then "had a conversation" that lasted "[a]bout two-and-a-half hours." This "conversation," at appellant's request, was not recorded. Harris then asked appellant whether "he wanted to put [his statement] on tape," and, while recording, Harris gave appellant "his [legal] warning" for a "second time." According to Harris, the entire interview, including both the recorded and unrecorded portions, lasted "[a]pproximately four hours."

We have previously held that a defendant's statement was not involuntary where law enforcement officers "talked to him for well over two hours before they finally reduced his statements to tape." *Martinez v. State*, No. 01-06-00619-CR, 2007 WL 1299806, at *5–6 (Tex. App.—Houston [1st Dist.] May 3, 2007, no pet.) (mem. op., not designated for publication) (internal quotations omitted); *see also Madrid v. State*, No. 08-04-00279-CR, 2006 WL 2704069, at *5–6 (Tex. App.—El Paso Sept. 21, 2006, pet. ref'd) (not designated for publication) (statement voluntary

after considering totality of circumstances, which included defendant being "interviewed for about one hour before his statement was taken and the entire process lasted about three hours"). As we explained in *Martinez*, although the length of an interrogation may be considered in determining the voluntariness of a statement, questioning by a law enforcement officer for several hours does not render a statement involuntary. *See Martinez*, 2007 WL 1299806, at *5. Other courts have held that the questioning of defendants for much longer duration than four hours did not render their statements involuntary. *See, e.g.*, *Smith v. State*, 779 S.W.2d 417, 428–29 (Tex. Crim. App. 1989) (eight hours of questioning without food did not render statement involuntary in light of defendant's willingness to continue and his understanding of his legal rights); *Bell v. State*, 169 S.W.3d 384, 391–92 (Tex. App.—Fort Worth 2005, pet. ref'd) (eight hours of questioning defendant while in handcuffs and leg shackles did not render his statement involuntary where he did not indicate he wanted to speak to attorney, did not want to answer any more questions, or wanted food, water, or bathroom breaks).

In regard to Officer Moreno's alleged "intimidation tactics," Officer Harris, at the suppression-hearing, did testify that Moreno was initially present in the room where appellant was interviewed at the Camp County Jail. "[W]ithin the first two minutes of [appellant] being in the room," Moreno "showed [appellant] a picture of one of [the] witnesses," a friend of appellant's, and said, "[N]ot everyone is afraid

28

of you, a lot of people are talking." Moreno then immediately left the room and did not return for the remainder of appellant's interview. As Harris explained, Moreno "just made a comment, showed [him] a picture and left"; he "[d]idn't ask any questions."

On appeal, appellant now claims that Officer Moreno's actions intimidated him. *Cf. Oursborn v. State*, 259 S.W.3d 159, 182 (Tex. Crim. App. 2008) (statement not involuntary where law enforcement officer "lied to him about some witnesses having identified him"). Notably though, appellant, at the suppression-hearing, did not testify that he felt intimidated by Moreno. Nor did he testify about Moreno at all. Further, appellant, in his brief, does not direct the Court to any evidence of his feelings of intimidation or any effect that Moreno's actions or words had on his willingness to give a statement to Officer Harris. *See* TEX. R. APP. P. 38.1(i) (brief must contain "clear and concise argument for the contentions made, with appropriate citations to authorities and to the record"). In fact, at the suppression-hearing, appellant specifically testified that the "only reason" that he spoke to Officer Harris was because of Harris's "promise to let Brandz go," not because he felt intimidated by Moreno.

Finally, in regard to Officer Harris's discussion of "justice and mercy" with appellant, Harris did testify at the suppression-hearing that he initially spoke to appellant about "justice and mercy" after he had advised appellant of his legal rights.

29

Although the "justice and mercy" discussion was not recorded, Harris explained the following to appellant:

> [J]ustice was basically people getting what they deserved. And, that people all the time cry out for justice. And, that if they were to look at circumstances that have happened, they might scream for justice in this case when you have a young lady with so much promise being killed, people are going to scream for justice and they are going to want this person to get what they deserve.
>
> . . . [M]ercy is another term—and . . . thank God everyday that you don't live in a society of justice, because if I got what I deserved and we all got what we deserved, this would be a hard place, a very hard place for people to live in. And, . . . I thank God everyday we live in a society of mercy, but what is mercy. And, we came to a conclusion that mercy was people getting what they need, not what they want.

Harris also "talked to [appellant] about the movie, with Jim Carey, *Bruce Almighty*, where Jim Carey has the powers of God." Harris explained to appellant:

> [Jim Carey] decides to give everyone what they want and answers yes when everyone prays to win the lottery, and I told him everyone got what they wanted, but they walked around with like $1.17 in their pocket, so it wasn't what they needed. So, many times we as people, we don't know how to ask for what we need.

Officer Harris's discussion with appellant about "justice and mercy" did not render appellant's statement involuntary. *See Nenno v. State*, 970 S.W.2d 549, 558 (Tex. Crim. App. 1998) ("[M]oral urging does not in itself render an accused's statement involuntary . . . ."), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720 (Tex. Crim. App. 1999); *see also Jackson v. State*, No. AP-75707, 2010 WL 114409, at *1–3 (Tex. Crim. App. Jan. 13, 2010) (not designated for

publication) (statement not involuntary where law enforcement officer spoke to defendant using "the theme of justice and mercy," spoke about "mercy in philosophical terms," and discussed movie *Bruce Almighty*); *Braden v. State*, No. 08-11-00034-CR, 2012 WL 1067192, at *5 (Tex. App.—El Paso Mar. 28, 2012, no pet.) (not designated for publication) ("The use of tactics which capitalize on an accused's 'moral sense of right and wrong' or comprise 'moral urging' does not in itself render an accused' statement involuntary . . . ."). The law permits law enforcement officers some use of psychological tactics to obtain a statement from suspects. *Hernandez v. State*, 421 S.W.3d 712, 717–18 (Tex. App.—Amarillo 2014, pet. ref'd); *see also Mason*, 116 S.W.3d at 260. And an officer may play on a suspect's sympathies or explain that honesty may be the best policy for a suspect hoping for leniency. *Hernandez*, 421 S.W.3d at 717–18; *Mason*, 116 S.W.3d at 260.

Here, contrary to appellant's assertion, the totality of the circumstances does not show that he made his statement involuntarily. Instead, it reveals that: (1) Officer Harris's interview of appellant was a "custodial interrogation"; (2) Harris advised appellant of his legal rights twice—once when appellant "came into the [interview] room" and again "on tape" before appellant made his tape-recorded statement; (3) appellant "indicate[d] [that] he understood all of" his rights by "nod[ding] his head" and saying "yes, or yeah"; (4) after being advised of his legal rights, appellant "agree[d] to waive his rights and speak to [Harris]"; (5) Harris and

31

appellant spoke for "[a]bout two-and-a-half hours" unrecorded; (6) the entire interview lasted "[a]pproximately four hours"; (7) appellant did not request an attorney "[a]t any time" during the interview; (8) appellant did not ask to terminate the interview and did not state that "he did not want to talk to [Harris]"; (9) Harris did not "coerce or threaten" appellant into giving a statement; (10) Harris did not, "directly or indirectly[,] promise [appellant] anything in exchange for his statement"; (11) Harris did not deny appellant, food, water, or use of the restroom or food, and he did offer appellant water to drink during the interview; and (12) appellant was "coherent" during the interview and "able to respond" to questions.

Nothing in appellant's tape-recorded statement or the testimony admitted at the suppression-hearing indicates that appellant's will was overborne or that he made his statement involuntarily. Based on the totality of the circumstances, we hold that the trial court did not err in concluding that appellant's statement was voluntarily made.

We overrule appellant's first issue.

**Admission of Evidence**

In his third issue, appellant argues that the trial court erred in admitting into evidence State's Exhibit 17, an autopsy photograph of the complainant, because "it had little probative value and a high potential to prejudice the minds of the jury." In

his sixth issue, appellant argues that the trial court erred in admitting into evidence State's Exhibits 11 and 12a, two different HPD photographic arrays, because the identifications, based on the arrays, were "irreparably tainted."[10]

*Autopsy Photograph*

Appellant specifically argues that State's Exhibit 17 "had little probative value and a high potential to prejudice the minds of the jury" because it is "gruesome," "shows the complainant with her stomach splayed open," "is not helpful to . . . [the] understanding of . . . the [complainant's] wound or cause of death," and the State could have used other exhibits to "prove the location of the gun shot" wound. *See* TEX. R. EVID. 403.

We review a trial court's ruling on the admission of evidence for an abuse of discretion. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011); *Walker v. State*, 321 S.W.3d 18, 22 (Tex. App.—Houston [1st Dist.] 2009, pet. dism'd). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to any guiding rules or principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990). When considering a trial court's decision to admit evidence, we will not reverse the trial court's ruling unless it falls outside the "zone

---

[10]    In his brief, appellant contends that the trial court erred in admitting into evidence State's Exhibits 11, 12, and 12a. However, because the trial court did not actually admit Exhibit 12 into evidence, we do not address appellant's contentions regarding State's Exhibit 12.

of reasonable disagreement." *Green v. State*, 934 S.W.2d 92, 102 (Tex. Crim. App. 1996) (internal quotations omitted).

To be admissible, evidence must be relevant. TEX. R. EVID. 401, 402. However, even relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice." TEX. R. EVID. 403. Rule 403 favors admissibility of relevant evidence, and the presumption is that generally relevant evidence will be more probative than unfairly prejudicial. *Montgomery*, 810 S.W.2d at 389. A rule 403 analysis must include, but is not limited to, the following factors: (1) the probative value of the evidence; (2) the extent that the evidence may "impress the jury in some irrational, but nevertheless indelible way"; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence. *Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006); *Montgomery*, 810 S.W.2d at 389–90. In regard to autopsy photographs, the court may also consider factors such as "the number of [photographs] offered, their gruesomeness, their detail, their size, whether they are in color or black-and-white, whether they are close up, whether the body depicted is clothed or naked, the availability of other means of proof, and other circumstances unique to the individual case." *Davis v. State*, 313 S.W.3d 317, 331 (Tex. Crim. App. 2010).

The opponent of the evidence has the burden to demonstrate that its negative attributes substantially outweigh any probative value. *Montgomery*, 810 S.W.2d at

377. We will uphold the trial court's ruling on a rule 403 balancing test, whether explicit or implied, if it is within the zone of reasonable disagreement. *Jabari v. State*, 273 S.W.3d 745, 752–53 (Tex. App—Houston [1st Dist.] 2008, no pet.).

State's Exhibit 17 is a photograph of the complainant's unclothed body from her pelvic area to her head. The photograph shows her abdomen, the portion of the complainant's body where the bullet lodged after entering through her right buttock, the medical intervention that the complainant required because of the gunshot wound she suffered, and the wound itself.

Lopez, an assistant medical examiner, testified that State's Exhibit 17 "represent[s] the [complainant's] body as it was [initially] received" by her from the hospital. Lopez performed an "external examination of the body," during which she discovered "a gunshot wound . . . on the right buttock." Lopez then conducted an "internal examination" of the complainant's body, looking at "the thoracic, the chest[,] and [the] abdominal cavity" in order to document the injury to internal organs that the complainant suffered. As Lopez explained:

> The bullet entered [the complainant's] pelvis and fractured her pelvic bone. It also perforated the inferior vena cava and the aorta in the abdominal cavity. It went through the small bowel mesentery, which is the root of the small bowel. . . . [The complainant] also had injuries to the stomach and injuries to the spleen.

Further, Lopez noted that the complainant had undergone "surgical intervention" at the hospital in an attempt to save her life. However, the complainant ultimately

"bled to death," "as a result of [the] gunshot wound [to] the right buttock into the abdomen."

Autopsy or post-autopsy photographs may be used to illustrate injuries and to reveal cause of death. *Drew v. State*, 76 S.W.3d 436, 452 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd); *see also Chamberlain v. State*, 998 S.W.2d 230, 237 (Tex. Crim. App. 1999). They are generally admissible as long as they aid the jury in understanding the injury and do not depict the mutilation caused by the autopsy itself. *Drew*, 76 S.W.3d at 452; *see also Rojas v. State*, 986 S.W.2d 241, 249 (Tex. Crim. App. 1998) (autopsy photographs admissible where depicted gunshot wounds and trauma to pelvic area resulting from defendant's actions, rather than autopsy). "A trial court does not err merely because it admits into evidence photographs which are gruesome." *Sonnier v. State*, 913 S.W.2d 511, 519 (Tex. Crim. App. 1995); *see Gallo v. State*, 239 S.W.3d 757, 763 (Tex. Crim. App. 2007) (trial court did not err in admitting "gruesome" photographs).

Here, State's Exhibit 17 was one of only six autopsy photographs[11] admitted into evidence, and it does not depict anything beyond what was covered by Lopez in her testimony. *See Harris v. State*, 661 S.W.2d 106, 107–08 (Tex. Crim. App. 1983) (autopsy photographs admissible where pictorial evidence helped jury

---

[11] At trial, State's Exhibits 16, 17, 18, 19, 20, 21, and 22 were identified as "autopsy photographs" of the complainant. However, State's Exhibit 20 is actually "an X-ray . . . showing [the] bullet in the [complainant's] abdominal wall."

understand verbal testimony). Lopez testified that State's Exhibit 17 depicts the state of the complainant's body when Lopez initially received it and prior to her performing the autopsy. *Cf. Rojas*, 986 S.W.2d at 249 (autopsy photographs admissible where they did not depict mutilation caused by autopsy itself, but rather gunshot wounds and trauma caused by the defendant's actions); *see also Yates v. State*, No. 09-14-00175-CR, 2015 WL 1535715, at *3, *6–8 (Tex. App.—Beaumont Apr. 1, 2015, no pet.) (mem. op., not designated for publication) (trial court did not err in admitting autopsy photographs "depicting the victim's body as it appeared when it arrived for the autopsy").

Further, the mere fact that the complainant, in State's Exhibit 17, is unclothed, which was necessary to show the surgical intervention that the complainant required and the internal injuries that she suffered as a result of the gunshot wound, is not sufficiently inflammatory to outweigh the photograph's probative value. *See Rojas*, 986 S.W.2d at 249 (photograph of unclothed victim with legs apart displaying trauma to pelvic area admissible); *Frank v. State*, 183 S.W.3d 53, 78 (Tex. App.— Fort Worth 2005, pet. ref'd) ("Photographs that depict the nature, location, and extent of a wound have been declared probative enough to outweigh any prejudicial effect."). And even if State's Exhibit 17 is considered "gruesome," the trial court did not err simply because it admitted into evidence a "gruesome" photograph. *Sonnier*, 913 S.W.2d at 519.

37

Finally, we note that there is no evidence in the record that State's Exhibit 17, when admitted into evidence, was a color-photograph; it is not a close-up photograph of the complainant and appears to be only four inches by six inches in size. *See Shuffield*, 189 S.W.3d at 787–88 (photographs three-and-one-half inches by five inches in size admissible); *Rojas*, 986 S.W.2d at 249–50 (holding admissible "picture of . . . unclothed body[,] . . . which display[ed] trauma to [the] pelvic area[,] . . . [was] not a close-up," and "torso and head [were both] visible in the picture").

Accordingly, we hold that the trial court did not abuse its discretion in concluding that the probative value of State's Exhibit 17 was not substantially outweighed by the potential for unfair prejudice and admitting the photograph into evidence.[12]

We overrule appellant's third issue.

*Pre-trial Photographic Arrays*

Appellant specifically argues that the trial court erred in admitting into evidence State's Exhibits 11 and 12a, the two HPD photographic arrays, because the

---

[12] The State argues that appellant did not preserve this issue for review because he "did not raise an unfair prejudice objection to State's Exhibit 17 at trial." At trial, appellant objected to the admittance of the autopsy photographs on the ground that they did not have "any" "probative value" "at all." Here, we have presumed, without deciding, that appellant's objection was sufficient to preserve his rule 403 complaint for appellate review.

arrays were "impermissibly suggestive" and "gave rise to a substantial likelihood of [an] irreparable misidentification."

Initially, we note that appellant has not preserved error in regard to the admission of State's Exhibit 11. During trial, the following exchange occurred:

| | |
|---|---|
| [State]: | . . . Judge, at this time I'm going to tender State's Exhibit No. 11 and offer it into evidence. |
| [Appellant's Counsel]: | Judge, we are only going to have one exception if the officer can clear it up. There appears to be some signatures on the second page of this document and we'd ask that the predicate be laid to clear up that testimony and then *we'd have no objection*. |
| The Court: | You may. After [the witnesses] made the identification, did you have them do anything? |
| [Officer Harris]: | Yes, sir, I did. |
| The Court: | What was that? |
| [Officer Harris]: | We had them sign the inside of the folder to indicate -- next to the number to indicate the picture that they've identified as the person. |
| [State]: | And those are the signatures that are located on the interior of State's Exhibit No. 11? |
| [Officer Harris]: | Yes. |
| The Court: | There being *no objection* with that qualification, No. 11 is admitted. |

(Emphasis added.)

Because appellant did not object in the trial court to the admission of State's Exhibit 11 on the ground that the photographic array was "impermissibly suggestive," he has not preserved his complaint for appellate review. *See* TEX. R. APP. P. 33.1(a); *Perry v. State*, 703 S.W.2d 668, 671 (Tex. Crim. App. 1986) (requiring defendant to complain or object in trial court to preserve argument pretrial identification suggestive); *Haq v. State*, 445 S.W.3d 330, 336–37 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd) ("[T]o the extent that [defendant] contends on appeal that the trial court erred in admitting the photo-arrays because . . . they were impermissibly suggestive . . . [defendant] has not preserved th[is] complaint[] for appellate review because he failed to object in the trial court on th[is] ground[]."). Accordingly, we address only appellant's complaint regarding State's Exhibit 12a.

We review de novo a trial court's ruling on the suggestiveness of a pre-trial photographic array. *Gamboa v. State*, 296 S.W.3d 574, 581 (Tex. Crim. App. 2009). First, we determine if the pretrial identification procedure was impermissibly suggestive. *Id.*; *Adams v. State*, 397 S.W.3d 760, 764 (Tex. App.—Houston [1st Dist.] 2013, no pet.). Second, if we conclude that the procedure was impermissibly suggestive, we then determine if the impermissibly suggestive nature of the pretrial lineup gave rise to a substantial likelihood of irreparable misidentification. *Gamboa*, 296 S.W.3d at 581–82; *Adams*. 397 S.W.3d at 764. If the pretrial procedure is found to be impermissibly suggestive, identification testimony would nevertheless be

40

admissible where the totality of the circumstances shows no substantial likelihood of misidentification. *Adams*, 397 S.W.3d at 764. To obtain reversal of his conviction, appellant must show by clear and convincing evidence that the identification has been irreparably tainted. *See Barley v. State*, 906 S.W.2d 27, 34 (Tex. Crim. App. 1995); *see also Santos v. State*, 116 S.W.3d 447, 451 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd).

Appellant argues that State's Exhibit 12a is "impermissibly suggestive" because the photographic array shows a "significant difference in appearance between Lewis[, the first suspect arrested for the complainant's murder,] and [a]ppellant." Specifically, "Lewis ha[d] corn row[s] styled hair" in the photographic array, while appellant did not. Further, according to appellant, "[s]ome of the subjects in the photo spread[] are also light skinned while [a]ppellant is depicted with dark skin."

As noted by the State in its brief, appellant did not raise the issue at trial that "[s]ome" of the individuals in the photographic array appear "light[er] skinned" than appellant. *See* TEX. R. APP. P. 33.1(a). However, even were we to presume that appellant preserved this particular complaint for appeal, variation in skin color does not render a photographic lineup impermissibly suggestive. *See Buxton v. State*, 699 S.W.2d 212, 216 (Tex. Crim. App. 1985) (noting "it is not essential that all individuals be identical" where two males in lineup had "dark[er] tone[d] skin" than

defendant); *Johnson v. State*, 901 S.W.2d 525, 535 (Tex. App.—El Paso 1995, pet. ref'd) (where "all six men in the photos were . . . of the same general skin color," "[a] lineup is not impermissibly suggestive merely because skin tones of the subjects vary").

In regard to appellant's complaint that he and Lewis, both of whom were pictured in State's Exhibit 12a's photographic array, had different hairstyles, Officer Harris explained that he compiled the photographic array with six photographs, one of appellant and five of "other [men] with similar characteristics," "similar hair," and "similar facial features." When questioned at trial by appellant's counsel about the differences in hairstyles between appellant and Lewis, Harris described Lewis's hair as "[a] little frizzy," "with [his] rounded forehead being shown," and being in "corn rows." Although appellant was not pictured with "corn rows," Harris testified that the hairstyles of appellant and Lewis were similar "as far as rounded," and he noted that the "corn rows" did not "affect the [general] shape of the head or hair."

In reviewing the photographic array, we note that the fact that Lewis's hair is braided, or in "corn rows," is not readily apparent, and all the men in the array have reasonably similar hairlines and head shapes. While a photographic array must contain individuals who fit the "rough description" of the suspect, it is not essential that all individuals be identical. *See Mims v. State*, 434 S.W.3d 265, 272–73 (Tex. App.—Houston [1st Dist.] 2014, no pet.); *see also Wilson v. State*, 15 S.W.3d 544,

553 (Tex. App.—Dallas 1999, pet. ref'd). Here, there are not any extreme distinctions, which would render the array impermissibly suggestive, in the hairstyles of the men pictured in State's Exhibit 12a. *See Ward v. State*, 474 S.W.2d 471, 476 n.5 (Tex. Crim. App. 1971) (because "[h]air styles, like clothing styles, change rather rapidly," requiring use of photographs of persons with "like hair styles" would place "impossible burden" on law enforcement officers); *Burks v. State*, No. 01-10-00633-CR, 2012 WL 151463, at *3–4 (Tex. App.—Houston [1st Dist.] Jan. 19, 2012, no pet.) (mem. op., not designated for publication) (photographic array not impermissibly suggestive where "all men [pictured] wore braids, only three wore beads [in their braids], and [defendant] was the only person with white beads at the top and bottom of his braids"); *Reed v. State*, Nos. 14-02-00671-CR, 14-02-00672-CR, 14-02-00673-CR, 2003 WL 21782537, at *1 (Tex. App.—Houston [14th Dist.] July 31, 2003, pet. ref'd) (mem. op., not designated for publication) (photographic array not impermissibly suggestive where defendant "was the only person with braided hair" and claimed "his hairline was different").

The trial court could have reasonably concluded that the photographic array was not impermissibly suggestive because all of the men in State's Exhibit 12a fit the "rough description" that Gay and Dixon gave to law enforcement officers— "black male, big build, six feet to six-one and about 19 to 20 years old." *See Mims*, 434 S.W.3d at 272–73; *Anderson v. State*, 414 S.W.3d 251, 259 (Tex. App.—

Houston [1st Dist.] 2013, pet. ref'd). Accordingly, we hold that the trial court did not err in admitting State's Exhibit 12a into evidence. *See Colgin v. State*, 132 S.W.3d 526, 532 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd) ("Because we conclude that the pretrial identification procedures were not impermissibly suggestive, we need not address whether those procedures created a substantial likelihood of misidentification.").

We overrule appellant's sixth issue.

### Jury Charge Error

In his second issue, appellant argues that the trial court erred in instructing the jury "on the law of transferred intent" because "the State failed to name and produce evidence" regarding a "specific person," other than the complainant, that appellant "intended to kill." In his fifth issue, appellant argues that the trial court erred in not "instructing the jury to disregard [a]ppellant's [tape-recorded] statement [to Officer Harris,] if it f[ound] [that] the statement was made involuntarily," because the voluntariness of the statement was "a contested issue at trial and the jury should have been told what to do if it" found that "[a]ppellant did not make it voluntary[ily]."

We review claims of jury charge error by first determining whether error occurred. *Sakil v. State*, 287 S.W.3d 23, 25 (Tex. Crim. App. 2009). If error does exist, we then evaluate whether sufficient harm resulted so as to require reversal. *See id.* at 25–26. If the defendant preserved error by timely objecting to the charge,

44

an appellate court will reverse if the defendant demonstrates that he suffered some harm as a result of the error. *Id.* If the defendant did not object at trial, we will reverse only if the error was so egregious and created such harm that the defendant did not receive a fair and impartial trial. *Id.* at 26. We look to the actual degree of harm in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel, and any other relevant information revealed by the record of the trial as a whole. *Almanza v. State*, 686 S.W.3d 157, 171 (Tex. Crim. App. 1985).

A trial judge has an absolute duty to prepare a jury charge that accurately sets out the law applicable to the case. TEX. CODE CRIM. PROC. ANN. art. 36.14 (Vernon 2007); *Oursbourn v. State*, 259 S.W.3d 159, 179 (Tex. Crim. App. 2008); *see also Vasquez v. State*, 389 S.W.3d 361, 366 (Tex. Crim. App. 2012) ("The purpose of the trial judge's jury charge is to instruct the jurors on all of the law that is applicable to the case."). When a statute requires an instruction under certain circumstances that are present in a case, the instruction is the "law applicable to the case." *Oursbourn*, 259 S.W.3d at 180 (internal quotations omitted). The trial court must give the instruction for the law applicable to the case regardless of whether it has been specifically requested. *Id.* at 179–81.

## Transferred-Intent Instruction

Appellant specifically argues that the trial court erred in including the transferred-intent instruction in its charge to the jury because "the application paragraph d[id] not state to whom [a]ppellant intended to cause serious bodily injury or death."  And he asserts that he "suffered some harm when the jury was instructed on the doctrine of transferred intent."

The trial court instructed the jury on the law of transferred intent as follows:

> A person is nevertheless criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated, or risked is that a different person or property was injured, harmed, or otherwise affected.

It then instructed the jury in the application paragraph:

> Now, if you believe from the evidence beyond a reasonable doubt that the defendant, Eric Dewayne Small, in Harris County, Texas, on or about the 12th day of April, 2004, did then and there unlawfully and intentionally or knowingly shoot a firearm at a third person, intending or knowing that serious bodily injury or death would occur to the third person, but instead, missed the third person and hit [the complainant], causing the death of [the complainant] with the use of a deadly weapon, namely a firearm, then you will find the defendant guilty of murder as charged in the indictment.

"A person is . . . criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated, or risked is that . . . a different person or property was injured, harmed, or otherwise affected."  TEX. PENAL CODE ANN. § 6.04(b)(2).  "This statutory principle of 'transferred intent' is raised when there is evidence a defendant with the required

46

culpable mental state intends to injure or harm a specific person but injures or harms a different person . . . . " *Manrique*, 994 S.W.2d at 647 (McCormick, J., concurring). In other words, "[t]he doctrine of transferred intent serves to expand a defendant's liability when an act has an unexpected consequence." *Juarez v. State*, 886 S.W.2d 511, 514 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd). A "classic example" of the application of the transferred intent doctrine is "the act of firing [a gun] at an intended victim while that person is in a group of other persons. If the intended person is killed, the offense is murder. If a different person in the group is killed, the offense is murder pursuant" to section 6.04(b)(2). *Roberts v. State*, 273 S.W.3d 322, 330 (Tex. Crim. App. 2008) (addressing transferred intent in capital murder case where requisite mental state was specific intent to kill), *abrogated in part by Ex parte Noms*, 390 S.W.3d 338 (Tex. Crim. App. 2013); *Chimney v. State*, 6 S.W.3d 681, 700 (Tex. App.—Waco 1999, pet. ref'd) ("Under the statute, a defendant can be held 'criminally responsible' (i.e., guilty) for the death of another even if he did not intend to harm the victim so long as he caused the actual victim's death while acting with the intent to kill a different person."). If a defendant "intentionally discharg[es] a firearm toward a group of people," he demonstrates that "he was aware that someone could be killed or that serious bodily injury could result from his committing an act clearly dangerous to human life." *Pettigrew v. State*, 999 S.W.2d 810, 813 (Tex. App.—Tyler 1999, no pet.).

Here, even were we to presume that the trial court erred in charging the jury on the law of transferred intent because "the State failed to name and produce evidence" regarding a "specific person," other than the complainant, that appellant "intended to kill," such error does not require reversal. *See Delacerda v. State*, 425 S.W.3d 367, 398 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (defendant did not show harm, when court presumed, without deciding, "that the trial court erroneously failed to name the specific intended victim in the application paragraph of the transferred intent instruction"); *see also Sakil*, 287 S.W.3d at 25–26 (if error does exist, appellate court evaluates whether sufficient harm resulted so as to require reversal).

At trial, appellant objected "to the paragraph [in the trial court's charge] that [was] specifically designed to define and include transferred intent" because there was not "any evidence presented [at trial] . . . that [appellant] fired a weapon at a third person with the intent to commit harm or serious bodily injury to that third person." However, on appeal, appellant now argues that the trial court erred in including the transferred-intent instruction in its charge to the jury because the application paragraph did not identify the "specific person" "to whom [a]ppellant intended to cause serious bodily injury or death." When a defendant's objection at trial does not comport with the specific complaint raised on appeal, error is not preserved and we review the record for "egregious harm," rather than "some harm."

*See Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002) ("[P]oint of error on appeal must comport with the objection made at trial."); *Johnson v. State*, 416 S.W.3d 602, 614–15 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (because defendant's jury-charge issue not preserved where issue on appeal did not comport with specific complaint made to trial court, appellate court reviewed record only for "egregious harm"); *Rivera v. State*, 12 S.W.3d 572, 577 (Tex. App.—San Antonio 2000, pet. ref'd) (where defendant "did not make any objection to the instruction," "error does not require reversal unless it is so egregious and created such harm that [defendant] was denied a fair and impartial trial").

In addition to instructing the jury on the law of transferred intent, the trial court charged the jury as follows:

> The defendant, Eric Dewayne Small, stands charged by indictment with the offense of murder, alleged to have been committed on or about the 12th day of April, 2004, in Harris County, Texas. The defendant has pleaded not guilty.
>
> Our law provides that a person commits the offense of murder if he intentionally or knowingly causes the death of an individual; or if he intends to cause serious bodily injury and intentionally or knowingly commits an act clearly dangerous to human life that causes the death of an individual.
>
> . . . .
>
> Now, if you find from the evidence beyond a reasonable doubt that on or about the 12th day of April, 2004, in Harris County, Texas, the defendant, Eric Dewayne Small, did then and there unlawfully, intentionally or knowingly cause the death of [the complainant], by shooting [her] with a deadly weapon, namely a firearm; or

> If you find from the evidence beyond a reasonable doubt that on or about the 12th day of April, 2004, in Harris County, Texas, the defendant, Eric Dewayne Small, did then and there unlawfully intend to cause serious bodily injury to [the complainant], and did cause the death of [the complainant] by intentionally or knowingly committing an act clearly dangerous to human life, namely by shooting [her] with a deadly weapon, namely a firearm, then you will find the defendant guilty of murder, as charged in the indictment.

Thus, pursuant to the trial court's charge, the jury could have convicted appellant of the offense of murder based on either direct intent or transferred intent. *Cf. Walker v. State*, No. 14-10-00389-CR, 2011 WL 977534, at *6 (Tex. App.—Houston [14th Dist.] Mar. 22, 2011, pet. ref'd) (mem. op., not designated for publication).

Notably, we have already held, in regard to appellant's fourth issue, that the evidence is sufficient to support his conviction of the offense of murder without consideration of the doctrine of transferred intent. *Cf. id.* When there is sufficient evidence upon which a jury could have convicted a defendant based on direct intent, rather than transferred intent, any error by the trial court in instructing the jury on transferred intent necessarily cannot result in "egregious harm" or rise to the level of precluding a fair and impartial trial. *See Sanchez v. State*, 376 S.W.3d 767, 774–76 (Tex. Crim. App. 2012) ("In a jury charge alleging alternative theories, harm must be measured at least in part, against the likelihood that the jury's verdict was actually based upon an alternative theory of culpability not affected by erroneous portions of the charge." (internal quotations omitted)); *Medina v. State*, 7 S.W.3d 633, 638 (Tex.

Crim. App. 1999) (overruling defendant's complaint trial court erred in instructing jury on transferred intent and concluding no egregious harm where conviction based on transferred intent unlikely); *Delacerda*, 425 S.W.3d at 398 (after court presumed trial court erred in charging jury on doctrine of transferred intent, defendant could not demonstrate "the result of the trial would have been different"); *Chirinos v. State*, No. 14-09-00919-CR, 2011 WL 166920, at *7 (Tex. App.—Houston [14th Dist.] Jan. 11, 2011, pet. ref'd) (mem. op., not designated for publication) (any error in instructing jury on transferred intent did not "r[i]se to the level of preventing the defendant from having a fair and impartial trial" where State "presented substantial evidence of th[e] offense").

Accordingly, we hold that appellant has failed to establish harm resulting from the trial court's error, if any, in instructing the jury on the law of transferred intent.

We overrule appellant's second issue.

*Voluntariness Instruction*

In regard to the voluntariness of his statement to Officer Harris, appellant asserts that "the trial court committed charge error by not . . . instructing the jury to disregard [his] statement if it f[ound] [that] the statement was involuntary." He further asserts that he "suffered egregious harm" as a result of the trial court's decision not to include the voluntariness instruction in its charge.

As noted above, a defendant's statement may be used as evidence against him only if it appears that it was "freely and voluntarily made without compulsion or persuasion." TEX. CODE CRIM. PROC. ANN. art. 38.21. Article 38.22 governs the admissibility of an accused's written and oral statement that results from a custodial interrogation. *Id.* art. 38.22 (Vernon Supp. 2015); *Oursbourn*, 259 S.W.3d at 171.

Article 38.22, section 6, provides for a general instruction by which the jury is asked to determine whether a defendant's statement was made under voluntary conditions. TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6; *Oursbourn*, 259 S.W.3d at 173. However, this section applies only "where a question is raised as to the voluntariness of a statement of an accused." TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6. The Texas Court of Criminal Appeals has held that a "question is raised" when a trial court is notified by the parties or raises on its own an issue about the voluntariness of a statement. *Oursbourn*, 259 S.W.3d at 175 (internal quotations omitted). Once a question is raised, the trial court must hold a hearing outside the presence of the jury to decide whether the defendant's statement was made voluntarily. *Id.* The trial court must make written findings of fact and conclusions of law in support of its ruling. *Id.* at 175 n.55. If the trial court finds that the statement was made voluntarily, it will be admitted into evidence, and the defendant may offer evidence before the jury that the statement was not, in fact, made voluntarily. *Id.* at 175. If the defendant does so, the trial court must give the jury a

voluntariness instruction. *Id.* In other words, "[a]n instruction must be given if a reasonable jury, viewing the totality of the circumstances, could have found that the statement was not voluntarily made." *Vasquez v. State*, 225 S.W.3d 541, 544 (Tex. Crim. App. 2007) (internal quotations omitted).

Article 38.22, section 6, requires that voluntariness be litigated in some manner before a jury. TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6; *Oursbourn*, 259 S.W.3d at 176. Although a factual dispute is not necessary to induce the requirement of a jury instruction, "[s]ome evidence must have been presented to the jury that the defendant's [statement] was not given voluntarily." *Vasquez*, 225 S.W.3d at 545–45; *see also Miniel v. State*, 831 S.W.2d 310, 317 (Tex. Crim. App. 1992) ("Only when some evidence is presented that a [statement] is not voluntary is the matter put in issue."). When there is no evidence before the jury to raise the issue of whether the statement was voluntarily made, there is no error when a trial court does not include the voluntariness instruction. *Vasquez*, 225 S.W.3d at 545. Thus, we must determine whether the evidence cited by appellant in his brief raised the issue of voluntariness before the jury.

Appellant argues that he, at trial, raised the issue of the voluntariness of his tape-recorded statement to Officer Harris because Harris testified that appellant was not "free to leave," was "in custody," and "asked not to be recorded for over half of the interview." However, appellant provides no citation to authority or to the record

53

to support his assertion that such testimony constitutes evidence that his statement was not made voluntarily. *See* TEX. R. APP. P. 38.1(i) (brief must contain "clear and concise argument for the contentions made, with appropriate citations to authorities and to the record"). And our review of the record reveals that Harris did not testify *at trial* that appellant was not "free to leave," was "in custody," and "asked not be recorded for over half of the interview." To the extent that such evidence is present in the record, it was introduced at the suppression-hearing and not in front of the jury. *See Jackson*, 2010 WL 114409, at *2 (explaining where "[a]ppellant's brief cites only to the motion-to-suppress hearing and does not discuss, or provide citation to, any testimony before the jury[,] . . . [a]ppellant's claim is inadequately briefed and subject to rejection on that ground alone"); *Martinez v. State*, No. 13-13-00714-CR, 2015 WL 5136360, at *6 (Tex. App.—Corpus Christi Aug. 31, 2015, pet. ref'd) (mem. op., not designated for publication) (defendant "cite[d] to no place in the record from the trial to show where he presented any evidence requiring the instruction on voluntariness"); *see also Oursbourn*, 259 S.W.3d at 175 ("[A] party may offer evidence before the *jury* suggesting that the confession was not in fact voluntary . . . if such evidence is offered *before the jury*, the trial judge shall give the jury a voluntariness instruction." (emphasis added)).

Nevertheless, our review of the trial record reveals no evidence upon which a jury could reasonably conclude that appellant's statement to Officer Harris was not

made voluntarily.[13] *See Vasquez*, 225 S.W.3d at 545; *see also Estrada v. State*, 313 S.W.3d 274, 299–300 (Tex. Crim. App. 2010). The evidence before the jury in the guilt phase of trial consisted of Officer Harris's testimony and appellant's recorded statement. Harris testified that he interviewed appellant while he was in custody at the Camp County Jail, and Harris was the only person present in the interview room with appellant. Before Harris began the interview, he advised appellant of his "constitutional rights"—he told appellant that "he had the right to remain silent"; "he had the right to an attorney"; "he had the right to have an attorney present during [the] time [Harris] w[as] asking him questions"; if he could not afford an attorney, he "had the right to have an attorney appointed"; and "he had the right to terminate [the] interview . . . any time he wanted to." Appellant indicated that he understood all of these rights by stating "yes," when, "[a]fter each right," Harris "asked him if he understood." And, after being advised of his rights, appellant agreed to waive his rights and speak to Harris, and he provided Harris with the recorded statement.

Officer Harris explained that there were two portions of his interview with appellant: one that was recorded on tape, and another which was not. The unrecorded portion of the interview lasted "almost three hours," while the recorded

---

[13] We also note that appellant did not attempt to argue to the jury that his statement was made involuntarily. *Cf. Zuniga-Duarte v. State*, No. 14-10-00967-CR, 2012 WL 1205170, at \*10 (Tex. App.—Houston [14th Dist.] Apr. 10, 2012, pet. ref'd) (mem. op., not designated for publication) (defendant made no argument to jury "as to how or why the evidence showed the statement was involuntary").

portion lasted "about 45 minutes." In total, the interview lasted "about four hours." Harris described appellant's speech during the unrecorded portion of the interview as "clear" and "not emotional."

Officer Harris further testified that appellant did not at any time during the interview "request that [Harris] stop speaking to him" or ask to terminate the interview. Appellant also did not request an attorney to be present while Harris conducted the interview. Harris did not "threaten" appellant, "deprive" him of food or the use of a restroom, or "promise him anything in exchange for him speaking to [Harris]."

Appellant's own tape-recorded statement also reveals that Officer Harris advised appellant of his legal rights before appellant made his statement, and appellant told Harris that he understood his rights. Appellant then waived his legal rights and spoke to Harris on tape. At no point during the tape-recorded portion of appellant's interview did he request to leave or terminate the interview nor did he request food, water, or a bathroom break. Nor did appellant indicate that he did not want to speak with Harris or that Harris had threatened or coerced him into making his statement.

After reviewing the totality of the circumstances surrounding appellant's statement, we conclude that no reasonable jury could have found from the evidence presented at trial that he made his tape-recorded statement to Officer Harris

involuntarily.  *Cf. Oursbourn*, 259 S.W.3d at 172–73 (describing factual scenarios which raise claim of involuntariness).  Accordingly, we hold that the trial court did not err in not instructing the jury on the issue of the voluntariness of appellant's statement.

We overrule appellant's fifth issue.

## Conclusion

We affirm the judgment of the trial court.


Terry Jennings
Justice

Panel consists of Justices Jennings, Higley, and Brown.

Do not publish.  TEX. R. APP. P. 47.2(b).